IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

KEVIN KENNEY

     Plaintiff,

vs.                                     CIV 18-728 MV/SCY

DEPARTMENT OF CORRECTIONS,
CORE CIVIC ARDEN, BETTY JUDD;
OFFICER ERICA VALLES;
OFFICER TAYLOR ARAGON; and
CENTURION, DYANNE LEYBA H.S.A.
MEDICAL DIRECTOR;
NURSE PRACTITIONER, LITA BAILLY,
In his individual and official capacity,

     Defendants.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

**THIS MATTER** comes before the Court on (1) Defendant Centurion Correctional

HealthCare of New Mexico, LLC, Lita Bailly, N.P.'s *Martinez* Report (Doc. 19) and (2)

Defendants Valles and Aragon's *Martinez* Report (Doc. 20), both filed June 20, 2019. On August

15, 2019, pursuant to 28 U.S.C. § 636(b)(1)(A) and Federal Rule of Civil Procedure 72(a),

United States District Judge Martha Vázquez referred this matter to me. Doc. 9. Consistent with

that Order of Reference, through this Proposed Findings and Recommended Disposition

("PFRD"), I recommend that the Court grant summary judgment in favor of Defendants Valles,

Aragon, and Bailly on the federal claims.

## PROCEDURAL HISTORY

Plaintiff, a pro se former inmate, filed this civil rights action on June 6, 2018 in state

court. Doc. 1-1. He alleges that prison officials were deliberately indifferent to his medical needs

in violation of the Eighth Amendment and that one official, Lita Bailly, committed medical

1

malpractice. He brought claims against individual wrongdoers: Nurse Practitioner ("NP") Lita Bailly, Officer E. Valles, and Counselor[1] Taylor Aragon; and claims against entities and prison supervisors: New Mexico Department of Corrections, Warden Betty Judd, Health Director Dyanne Leyba, and Centurion. Defendants removed this matter to federal court on July 30, 2018. Doc. 1. Defendants CoreCivic, Judd, Valles, and Aragon filed a Motion to Dismiss, Doc. 3, while Plaintiff filed a Motion for Default Judgment, Doc. 10. The Court entered an order staying any filing obligations until it finished screening the Complaint as required by 28 U.S.C. § 1915A. Doc. 12.

On March 27, 2019, the Court concluded its screening obligation and entered a Memorandum Opinion and Order. Doc. 13. In that Order, the Court denied Plaintiff's Motion for Default Judgment and granted in part Defendants' Motion to Dismiss. Specifically, the Court dismissed with prejudice all claims against New Mexico Department of Corrections and dismissed without prejudice all claims against Judd, Leyba, and Centurion. Doc. 13 at 7. The Court granted Plaintiff 30 days to file a supplemental pleading against Judd, Leyba, and Centurion and warned Plaintiff that failure to do so may result in dismissal of those defendants. *Id.* Plaintiff never filed a supplemental pleading. Accordingly, for the reasons stated in the March 27, 2019 Memorandum Opinion and Order (Doc. 13), I recommend dismissing with prejudice all claims against Defendants Judd, Leyba, and Centurion.

In its screening Order, the Court also held that Plaintiff stated an Eighth Amendment claim against individual Defendants Valles, Aragon, and Bailly and a negligence claim against Defendant Bailly. Doc. 13 at 6. Defendant Bailly previously filed an answer, Doc. 6, so the Court

---

[1] Plaintiff refers to Taylor Aragon as "Officer Aragon". However, Taylor Aragon's affidavit indicates he is a Correctional Counselor. Doc. 20-4. The Court will therefore refer to him as "Counselor Aragon".

ordered only Defendants Valles and Aragon to answer, Doc. 13 at 6, which they did on April 26, 2019, Doc. 14.

On May 3, 2019, the Court ordered the remaining defendants, Valles, Aragon, and Bailly, to file a *Martinez* report, with or without a dispositive motion. Doc. 16. Defendants filed their respective reports on June 20, 2019, with requests that the reports be construed as motions for summary judgment. Docs. 19 (report from Baily), 20 (report from Valles and Aragon). After receiving an extension of time, Plaintiff filed his response on September 5, 2019, Doc. 25, and Defendants filed their replies on September 19, 2019, Docs. 26, 28.

The remaining claims in Plaintiff's Complaint are: (1) Eighth Amendment deliberate indifference to serious medical needs against Defendants Valles and Aragon based on their alleged conduct that occurred April 26, 2018; (2) Eighth Amendment deliberate indifference to serious medical needs against Defendant Bailly based on her alleged conduct that occurred on April 26, 2018, and failure to carry out medical orders based on her alleged conduct that occurred on April 28, 2018 and April 29, 2018; and (3) medical malpractice against Defendant Bailly. Defendants each move for summary judgment as to all claims against them.

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In other words, a dispute is genuine "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and it is material "if under the substantive law it is essential to the proper disposition of the claim." *Becker v.*

*Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) (internal quotation marks omitted). To determine if there are any genuine issues of material facts, the Court may look to, among other things, affidavits. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). In the context of this case "[a] *Martinez* report is treated like an affidavit," as is Plaintiff's Complaint "if it alleges facts based on the plaintiff's personal knowledge and has been sworn under penalty of perjury." *Id.* at 1111.

In reviewing a motion for summary judgment, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. *S.E.C. v. Thompson*, 732 F.3d 1151, 1156-57 (10th Cir. 2013) (internal quotation marks omitted). Initially, the party seeking summary judgment has the burden of showing that there is no genuine dispute as to any material fact. *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the non-moving party must show that genuine issues remain for trial. *Id.* "[W]here the non moving party will bear the burden of proof at trial on a dispositive issue that party must go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to that party's case in order to survive summary judgment." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000). "[T]he court is not authorized to accept factual findings of the prison investigation when the plaintiff has presented conflicting evidence." *Hall*, 935 F.2d at 1111. To that end, "[a] bona fide factual dispute exists even when the plaintiff's factual allegations that are in conflict with the *Martinez* report are less specific or well-documented than those contained in the report." *Id.* at 1109.

## UNDISPUTED MATERIAL FACTS

The Court draws the following facts from Plaintiff's Complaint (Doc. 1-1), which he swore under penalty of perjury, as well as information in the *Martinez* reports (Docs. 19, 20).

4

The facts are undisputed, except where indicated otherwise. On April 26, 2018, Plaintiff Kevin Kenny was an inmate at Northwest New Mexico Correctional Center ("NNMCC"). Doc. 1-1 ¶ 8. That morning,[2] he was at work in the correctional industry when he got up from his station and went to the restroom. Doc. 1-1 ¶ 9. Upon untying his pants to use the restroom, he felt wetness running down his leg and when he sat on the toilet he began bleeding large amounts of blood from his rectum. Doc. 1-1 ¶ 10. He advised his supervisor of his condition, and his supervisor immediately allowed him to leave and go to medical. Doc. 1-1 ¶¶ 11-12. As he was proceeding to medical, he felt more blood running down his leg so he stopped at another restroom in the education unit. Doc. 1-1 ¶¶ 13-14; Doc. 20-2, Ex. 4. Plaintiff then proceeded the rest of the way to medical. Doc. 20-2, Exs. 5-9.

Upon arriving at medical, Plaintiff told an officer what was happening, and the officer immediately retrieved a nurse. Doc. 1-1 ¶ 15. Between 9:47 am and 9:56 a.m., the nurse spoke to Plaintiff, completed paperwork, and took his vital signs. Doc. 1-1 ¶ 16; Doc. 20-2, Ex. 9. The nurse then took Plaintiff's medical file to NP Lita Bailly. Doc. 1-1 ¶ 17. While Plaintiff sat outside NP Bailly's office waiting to be seen, he continued bleeding. Doc. 1-1 ¶ 18. As he sat bleeding, with blood coming through the seat of his pants, he could hear NP Bailly talking to another inmate about her dogs. Doc. 1-1 ¶ 18. Plaintiff waited by himself from 9:56 a.m. to 10:05 a.m. Doc. 20-2, Ex. 9. Then, before being seen by NP Bailly, Plaintiff stood up, felt blood running down his leg, and told a present officer that he was going to his unit to take a shower.

---

[2] There is some dispute around the timeline of the morning events. Plaintiff asserts it was around 9:30 a.m. when he first noticed the bleeding. Doc. 1-1 ¶ 8. His medical records document that he first arrived at medical around 8:50 a.m. Doc. 19-4 at 37. The video recording shows he left the education unit at 9:43 a.m. and arrived at medical at 9:45 a.m. Doc. 20-2, Exs. 4-9. The discrepancy is not material to the present motion and the Court will follow the timeline of the videos, which is the same timeframe Plaintiff provides.

Doc. 1-1 ¶ 19; Doc. 20-2, Ex. 9. The video recording does not show any blood on the seat of the chair when Plaintiff stood up. Doc. 20-2, Ex. 9. Plaintiff returned to his pod at 10:07 a.m. and took a shower. Doc. 1-1 ¶ 20; Doc. 20-2, Ex. 10.

Officers conducted count that morning at 10:45 a.m., which usually takes 45-60 minutes to clear. Doc. 20-3 ¶ 5. Around 11:30 a.m., Plaintiff approached Officer Valles and asked if he could go to medical. Doc. 20-3 ¶ 5. Plaintiff did not indicate he was having an emergency or that he was bleeding, and Officer Valles did not observe any blood. Doc. 20-3 ¶ 7. Officer Valles informed Plaintiff he should wait until count has cleared due to facility policy that requires all inmate movement cease until count clears. Doc. 20-3 ¶¶ 6-7.

Plaintiff asserts that, during count, he informed Counselor Aragon about his medical condition, including that he was bleeding large amounts of blood. Doc. 1-1 ¶¶ 20-21. While Counselor Aragon agrees that Plaintiff approached him during count and asked to go to medical because he was bleeding from his rectum, Counselor Aragon asserts that Plaintiff reported he was only bleeding a little and that he did not feel faint. Doc. 20-4 ¶¶ 5-6, 9. Counselor Aragon further asserts that he did not observe any blood, that Plaintiff did not appear pale, sweaty, or ill, that Plaintiff did not indicate he was having an emergency medical issue, and that Plaintiff agreed to wait until count was over to go to medical. Doc. 20-4 ¶¶ 7, 10, 12-13. Counselor Aragon instructed Plaintiff to write an informal complaint. Doc. 1-1 ¶ 20; Doc. 20-4 ¶ 15. Plaintiff asserts that he objected because he was still bleeding, but that he returned to his dorm to wait for count to clear and wrote an informal complaint. Doc. 1-1 ¶¶ 21-22. He asserts that he felt weak from the large amounts of blood he lost, so another inmate assisted him in writing the informal complaint. Doc. 1-1 ¶ 22.

After count cleared Plaintiff again approached Officer Valles and asked to go to medical. Doc. 1-1 ¶ 23; Doc. 20-3 ¶ 9. Plaintiff asserts that he informed Officer Valles he was having a medical emergency. Doc. 1-1 ¶ 23. Officer Valles, however, asserts that Plaintiff did not tell him it was a medical emergency or that he was bleeding and Officer Valles did not observe any blood. Doc. 20-3 ¶¶ 11, 13. Officer Valles told Plaintiff to wait until mealtime was called for his unit, which occurred at approximately 12:20 p.m., because only secured movement is allowed between count being cleared and chow being called. Doc. 1-1 ¶ 23; Doc. 20-3 ¶¶ 9-10.

Plaintiff waited, again going to the restroom to clean up large amounts of blood from his rectum, and was able to leave when the dorm door opened for another inmate to come in. Doc. 1-1 ¶¶ 24-25; Doc. 20-2, Ex. 12. Plaintiff proceeded to medical, but was unable to get in, so he went to look for help. Doc. 1-1 ¶ 26; Doc. 20-2, Ex. 14. He encountered Captain Patricio in the hallway and gave him the informal complaint. Doc. 1-1 ¶¶ 27-28. Captain Patricio sent Plaintiff back to medical. Doc. 1-1 ¶ 29.

Plaintiff arrived back at medical around 1:00 p.m. Doc. 20-2, Ex. 15. After a brief conversation with Nurse Casias, he was taken to see NP Bailly, who he informed about his condition. Doc. 1-1 ¶ 31; Doc. 19-4 at 37. NP Bailly noted his rectal bleeding in the Progress Notes and informed Plaintiff that she would order some labs and schedule a colonoscopy. Doc. 19-4 at 37; Doc. 1-1 ¶ 31. After speaking to someone on the phone about his situation, NP Bailly informed Plaintiff he would need to go to the emergency room. Doc. 1-1 ¶¶ 32, 33; Doc. 19-4 at 36. By 1:20 p.m., NP Bailly reported to Dr. Deming that Plaintiff may need to be seen by Community General Hospital Emergency Room. Doc. 19-4 at 37. NP Bailly signed Plaintiff's transfer order at 1:30 p.m., Doc. 20-5 at 3, and he left medical for transport around 2:00 p.m., Doc. 20-2 at 15.

Plaintiff was transported to Cibola General Hospital where his vitals were initially taken at 2:45 p.m. Doc. 19-4 at 5; Doc. 1-1 ¶¶ 36-37. He was admitted for monitoring and seen by several medical professionals. Doc. 19-4 at 14. Plaintiff reported rectal bleeding when having a bowl movement, but reported no abdominal pain, diarrhea, nausea, vomiting, dizziness, or headaches. Doc. 19-4 at 15. After a surgical consult, Plaintiff was scheduled for "scope" the following morning "to evaluate the source of bleeding." Doc. 19-4 at 15; Doc. 1-1 ¶ 37. On April 27, 2018, Plaintiff received a colonoscopy that produced the following results: "Blood and clots in the descending colon. Pedunculated polyp at 25-30 cm measuring approximately 1.5 to 2 cm in length and 1 cm in width. Remainder of colon appear to be within normal limits." Doc. 19-4 at 2. The surgeon suspected the polyp was the source of Plaintiff's bleeding, snared it at the base, and inspected for further bleeding. Doc. 19-4 at 2. Plaintiff understood that the surgery went well and the bleeding was stopped. Doc. 1-1 ¶ 41. Following surgery, Plaintiff was kept in the hospital for 24 hours to monitor for further bleeding. Doc. 19-4 at 3; Doc. 1-1 ¶ 42.

Plaintiff was discharged from Cibola General Hospital on April 28, 2018 and was given discharge instructions and discharge medication. Doc. 1-1 ¶ 43;  Doc. 19-4 at 4. Upon return to Northwest New Mexico Correctional Center, Plaintiff was taken to medical and cleared by Nurse Juan to return to general population. Doc. 1-1 ¶¶ 44-45; Doc. 19-4 at 38. Nurse Juan informed Plaintiff that NP Bailly changed some of his medication and that his medication would be sent to his dorm on the med-cart. Doc. 1-1 ¶¶ 45, 47. Indeed, the notes from medical indicate that "Bailly contacted made aware of Rx, they were successfully faxed to Walgreens in Grants, NM." Doc. 19-4 at 38. On the Return From Off-Site Healthcare form, NP Bailly acknowledged the "recommended medications," including Xarelto, Flexerial, and Toprol. Doc. 19-4 at 16. The note next states "Bailly ordered Xarelto 10mg PO #14 tablets 2po daily." Doc. 19-4 at 38. The final

note from April 28, 2016 states "Bailly did not okay the rest of the Rxs at this time." Doc. 19-4 at 38.

When the med-cart arrived in Plaintiff's dorm that evening, Plaintiff was asleep. Doc. 1-1 ¶ 48. An officer later woke up Plaintiff for the 10:00 p.m. count. Doc. 1-1, ¶ 49. Plaintiff then asked two officers about his medication and was informed he could take his medication in the morning. Doc. 1-1, ¶¶ 50-51. The following morning, Nurse Jen came to Plaintiff's dorm to see other inmates and Plaintiff asked her why he had not received his medication the night before. Doc. 1-1 ¶ 52. Nurse Jen informed Plaintiff that NP Bailly changed Plaintiff's medication order so that he would take blood-thinners (Xarelto) in the morning. Doc. 1-1 ¶ 53. Plaintiff informed Nurse Jen of his condition and his procedure at the hospital and Nurse Jen immediately provided Plaintiff with his blood thinning medication. Doc. 1-1 ¶¶ 54-56. Nurse Jen informed Plaintiff the rest of his medication would be on the med-cart, but Plaintiff never received his additional medication. Doc. 1-1 ¶¶ 56-57.

At 10:50 p.m. on April 29, 2018 Plaintiff "was brought to medical with complaints that he was not receiving his new evening medication." Doc. 19-4 at 17. RN Jonenne Owens documented that she reviewed Plaintiff's chart and MAR: "States on progress note that Baily [sic] ordered Xarelto 10mg #14 tablets 2 by mouth daily. Further instructions from Dr. Amanda Young that this medication is to be taken with the evening meal for A. fib. [Plaintiff's] MAR reflects [that] a mis-scheduling occurred and was documented for am. MAR was corrected to occur at evening medline." Doc. 19-4 at 17. NP Bailly wrote a follow-up note on May 1, 2018 that "[i]t does not matter what time he takes his Xarelto as there is no requirement for INR. See order." Doc. 19-4 at 17. That same day, NP Bailly signed and dated each page of the report from Cibola General Hospital. Doc. 19-4 at 18-27.

Following his return from the hospital, Plaintiff saw medical a number of times for unrelated issues. Doc. 19-4 at 29- 35, 48, 51 (back pain in June through September 2018); Doc. 19-4 at 40- 47, 49 (allergies in October through November 2018). However, there are no further notes on issues related to his polyps or prescriptions.

## EXHAUSTION

As an initial matter, Defendants Valles and Aragon assert that Plaintiff did not exhaust his administrative remedies as to claims against them before filing suit. Section 1997e(a) of the Prison Litigation Reform Act ("PLRA") requires that no action be brought "with respect to prison conditions under Section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. 1997e(a). This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes," *Porter v. Nussle*, 534 U.S. 516, 532 (2002), including suits where an inmate is only seeking money damages, *Booth v. Churner*, 532 U.S. 731, 734 (2001). To meet this requirement, an inmate must exhaust all available remedies, *Porter*, 534 U.S. at 524, and the exhaustion requirement is not satisfied by an "untimely or otherwise procedurally defective administrative grievance or appeal." *Woodford v. Ngo*, 548 U.S. 81, 83 (2006).

Failure to exhaust does not deprive a federal court of jurisdiction over the matter. *Steele v. Fed. Bureau of Prison*, 355 F.3d 1204, 1208 (10th Cir. 2003), *abrogated on separate grounds by Jones v. Bock*, 549 U.S. 199 (2007). However, exhaustion is mandatory under the PLRA and "unexhausted claims cannot be brought in court." *Jones*, 549 U.S. at 211. The court, therefore, must dismiss any unexhausted claims, though dismissal without prejudice is usually preferable. *Gallagher v. Shelton*, 587 F.3d 1063, 1068 (10th Cir. 2009). Failure to exhaust is an affirmative

defense to be raised and proven by the defense. *See Jones*, 549 U.S. at 216; *Roberts v. Barreras*, 484 F.3d 1236, 1241 (10th Cir. 2007).

Whether a plaintiff has fully exhausted his claims depends on the whether he met the grievance procedure set forth by his place of incarceration. *See Jones*, 549 U.S. at 218. The grievance procedure in place during this incident at NNMCC is as follows.

A.  NNMCC grievance procedure

First, an inmate is required to participate in informal resolution by filling out an Inmate Informal Complaint form within 5 working days of the incident giving rise to the complaint. Doc. 20-6 at 4, ¶¶ 14-15; Doc. 20-6 at 20. The Informal Complaint must be addressed to the Unit Manager, or his or her designee, and the Chief of Security, or his or her designee, and must explain the incident in detail. Doc. 20-6 at 4, ¶ 16; Doc. 20-6 at 20. The Unit Manager, Chief of Securities, or designee will log and track the Informal Complaint and will return an Informal Resolution form to the inmate and to a Grievance Officer within 5 working days of receipt of the complaint. Doc. 20-6 at 4-5, ¶ 17; Doc. 20-6 at 20.

Next, if the inmate is not satisfied with the results of the informal resolution process, the inmate may fill out a formal Inmate Grievance form within 5 working days of receipt of the response to the informal complaint. Doc. 20-6 at 5, ¶ 18; Doc. 20-6 at 20. The Inmate Grievance must state what relief the inmate is requesting and include a copy of the completed Informal Resolution. Doc. 20-6 at 5, ¶ 18. The Inmate Grievance must be submitted to the Grievance Officer by depositing the form in the facility mailbox, in a designated grievance box, or by delivering it in person to the Grievance Officer. Doc. 20-6 at 5, ¶ 21; Doc. 20-6 at 20. Failure to provide complete information or meet all the requirements will result in the grievance being returned to the inmate for completion. Doc. 20-6 at 5-6, ¶¶ 18, 24.

The Grievance Officer notifies the inmate of receipt of the formal grievance with an Inmate 5-Day Notice of Receipt of Formal Grievance form. Doc. 20-6 at 5, ¶ 22. The Grievance Officer enters the grievance into the Computer Management Information System ("CMIS") for the state of New Mexico and assigns it a CMIS number. Doc. 20-6 at 5, ¶ 22. Emergency grievances are answered within 3 working days from the date of receipt, if the grievance is a verifiable emergency. Doc. 20-6 at 5, ¶ 19. Otherwise, within 15 working days from receipt of the grievance, the Grievance Officer conducts an investigation, including interviewing the inmate, and completes the Grievance Officer's report portion of the Inmate Grievance form to deliver to the Warden. Doc. 20-6 at 6-7, ¶¶ 25, 26. The Warden reviews the grievance, along with any comments from inmates and staff, and makes a decision within 15 days of receipt of the grievance. Doc. 20-6 at 6, ¶ 28. The inmate is informed in writing of the Warden's decision, his right to appeal, and the method by which to appeal, within 5 working days of the decision. Doc. 20-6 at 6, ¶ 29.

B. <u>Plaintiff's grievances</u>

In this case, Plaintiff submitted numerous grievances related to his April 26, 2018 medical issue and his April 28/29, 2018 medication issue, each one of which Defendants Valles and Aragon assert was untimely or defective in some other manner. The Court disagrees, finding that Plaintiff filed timely grievances on April 26, 2018 and April 29, 2018.

**1. April 26, 2018**

As described in the facts above, on the morning of April 26, 2018, Plaintiff noticed he was bleeding from his rectum. He initially went to medical, but left and returned to his unit. Once in his unit, he sought to return to medical. After being told by Officer Valles and Counselor Aragon that he needed to wait, he wrote an informal complaint. Later, as he was trying to return

to medical, he encountered Captain Patricio and gave him the informal complaint. Captain Patricio sent him to medical.

Plaintiff followed NNMCC's grievance procedure by submitting a timely informal complaint to Captain Patricio. It is not clear what Plaintiff wrote in his informal complaint because he did not retain a copy and a copy did not make it into his grievance file. *See generally* Doc. 20-6 (affidavit of Grievance Officer discussing all grievances in Plaintiff's file that relate to the April 26, 2018 incident). "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirement, not the PLRA, that define the boundaries of proper exhaustion." *Jones*, 549 U.S. at 218. Here, NNMCC's grievance policy only requires that the inmate "explain the complaint in detail." Doc. 20-6 at 4, ¶ 16. Defendants offer no argument that Plaintiff's April 26 informal complaint did not contain enough detail to meet the policy's requirement. Additionally, while Defendants assert that Plaintiff had time to resubmit his grievance after returning from the hospital, Doc. 26 at 2, Defendants make no argument that the April 26 informal complaint was defective or that Plaintiff needed to resubmit it.

Following Plaintiff's informal complaint, the next step was for NNMCC to respond with an informal resolution, which it never did. Instead, Plaintiff states in his response brief that "[w]hen Plaintiff returned from the hospital, Captain Patricio informed the Plaintiff that he did not process the informal grievance with the grievance officer because Plaintiff was transported to the emergency room." Doc. 25 at 2. In essence, Captain Patricio informed Plaintiff that his informal complaint was denied as moot without following NNMCC's policy to provide an informal resolution. *See* Doc. 20-6 at 20 ("The Unit manager, Chief of Security, or Institutions designee's in charge of the informal resolution must address the issue and return the Informal

Resolution form to the inmate and a copy to the grievance officer within 5 working days of receipt of the complaint.").

Under NNMCC's policy, after an informal complaint is resolved, an inmate must submit a formal grievance. In this instance, Plaintiff did not follow-up with a timely formal complaint[3] because he never received an informal resolution to his informal complaint. The grievance procedure only requires a formal complaint "[i]f the inmate is not satisfied with the results of the informal resolution process." Doc. 20-6 at 5, ¶ 18. The inmate may then "file an Inmate Grievance form within 5 working days of the *receipt of the response to the Informal Complaint* and *must include a copy of the completed informal resolution* . . . . A grievance that is untimely, incomplete, or otherwise improperly submitted is returned to the inmate with an explanation of why it is being returned." Doc. 20-6 at 5-6, ¶¶ 18, 24 (emphasis added).

Plaintiff followed the steps available to him by submitting an informal complaint, to which he never received an informal resolution. Any defect in exhaustion was "procured from the action or inaction of prison officials." *Little v. Jones*, 607 F.3d 1245, 1250 (10th Cir. 2010); *see also Ross v. Blake*, 136 S. Ct. 1850, 1856, 1859 (2016) ("Under the PLRA, a prisoner need only exhaust 'available' administrative remedies" and "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end . . . .").

In response, Defendants Valles and Aragon argues that "Plaintiff presents no evidence that this informal grievance ever existed." Doc. 26 at 2. It is unclear what further evidence Defendants are seeking: it logically follows that Plaintiff does not still have the informal

---

[3] Plaintiff attached to his response brief copies of multiple letters he sent to the Department of Corrections in Santa Fe. Doc. 25 at 9-21. These letters are not formal complaints as required by NNMCC's procedure because Plaintiff did not submit them to the facility's Grievance Officer.

complaint because he gave it to Captain Patricio. In any event, Defendants' argument fails because Plaintiff has stated in his sworn Complaint that he wrote an informal complaint and gave it to Captain Patricio. *See Hall*, 935 F.2d at 1111 ("The plaintiff's complaint may . . . be treated as an affidavit if it alleges facts based on the plaintiff's personal knowledge and has been sworn under penalty of perjury."). Defendants, on the other hand, do not present any evidence to create a dispute as to whether Plaintiff wrote the informal complaint and provided it to Captain Patricio. They do not, for example, offer an affidavit from Captain Patrico stating that he never received an informal complaint. The Court finds Plaintiff's undisputed statement to be sufficient for the purposes of summary judgment to determine that Plaintiff submitted an informal complaint on April 26, 2018.

For these reasons, I recommend finding that Plaintiff exhausted his administrative remedies for his Eight Amendment claims against Defendants Valles, Aragon, and Bailly based on the incident that occurred on April 26, 2018.

### 2. April 29, 2018

On April 29, 2018, Plaintiff submitted a formal grievance, which he titled "Emergency Grievance." Doc. 20-6 at 7, ¶ 32; Doc. 20-6 at 52. He listed the date of incident as April 29, 2018 and attached a narrative regarding his medication on April 28 and April 29. Doc. 20-6 at 7, ¶ 32; Doc. 20-6 at 52-56. The Grievance Officer accepted the grievance for consideration on April 30, 2018. Doc. 20-6 at 7, ¶ 33; Doc. 20-6 at 52.

The Grievance Officer investigated the grievance by communicating with the facility Heath Services Administrator ("HSA") D. Leyba. Doc. 20-6 at 7 ¶ 34; Doc. 20-6 at 58-59. HSA Leyba responded, providing clarification on the medication orders and dosage that Plaintiff had received since his return from the hospital. Doc. 20-6 at 7, ¶ 35; Doc. 20-6 at 58. On May 1,

2018 the Grievance Officer filled out the portion of the Inmate Grievance form for her investigation, noting that Plaintiff had received proper medical treatment. Doc. 20-6 at 7, ¶ 33; Doc. 20-6 at 50. That same day, the Warden denied the grievance, writing that "medical needs according to Ms. Leyba are being addressed." Doc. 20-6 at 8, ¶ 38; Doc. 20-6 at 50.

Plaintiff appealed the decision, and the Grievance Officer sent his grievance on May 3, 2018 to Steve Madrid, the Statewide Disciplinary/Grievance Appeals Administrator at NMCD Central Office. Doc. 20-6 at 8, ¶¶ 39-40; Doc. 20-6 at 50-51. On May 7, 2018, German Franco, the Director of NMCD Adult Prisons, responded to the appeal, finding that a nurse changed the doctor's order such that Plaintiff received medication in the morning instead of in the evening, but that the medication can be taken at any time of the day. Doc. 20-6 at 8, ¶ 41; Doc. 20-6 at 49. He therefore agreed with the decision of the Grievance Officer and the Warden and denied the grievance. Doc. 20-6 at 8, ¶ 41; Doc. 20-6 at 49. He also noted that Plaintiff had exhausted his administrative remedies. Doc. 20-6 at 8, ¶ 41; Doc. 20-6 at 49.

There is no legitimate dispute that, based on this process, Plaintiff exhausted his administrative remedies as to his claim against NP Bailly for failure to carry out medical orders on April 28, 2018 and April 29, 2018.

### 3. Other Grievances

Defendants Valles and Aragon spend the majority of their exhaustion argument on discussing other, subsequent grievances Plaintiff filed. Those grievances addressed the same claims brought in the present Complaint, including:

- Inmate Grievance filed on May 11, 2018, stating: "On May 4, 2018, I filed a inmate informal complaint against Ms. Bailly and Centurion. I have not received a response back as of the date listed below." Doc. 20-6 at 9 ¶ 42; Doc. 20-6 at 61. The attached informal

complaint was a typewritten letter dated May 4, 2018 that addressed the April 26, 2018 incident and Plaintiff's claim regarding medication on April 28/29, 2018. Doc. 20-6 at 63-66.

- Informal Complaint filed June 4, 2018 that read: "On May 24, 2018 I wrote a request to Ms. Garcia requesting a[n] internal investigation into my complaint per Detective Sergeant White of the Grants Police Department and have not had a response as of this date. Therefore I'm requesting a full investigation." Doc. 20-6 at 10, ¶ 48; Doc. 20-6 at 68. Plaintiff attached an Inmate Sworn Statement, dated May 14, 2018, describing the April 26, 2018 medical issue and the April 28/29, 2018 medication issue. Doc. 20-6 at 10, ¶ 49; Doc. 20-6 at 69-72.

- Formal Inmate Grievance filed June 8, 2018, listing the date of incident as June 7, 2018 and requesting "a full internal investigation into my Inmate Sworn Statement and witness interviews." Doc. 20-6 at 10, ¶ 52; Doc. 20-6 at 76. Plaintiff attached a narrative complaining that the Grievance Officer returned his June 5, 2018 informal complaint against Ms. Garcia as filed out of time. Doc. 20-6 at 10, ¶ 52; Doc. 20-6 at 79.

Defendants address each of these grievances, arguing they are untimely and otherwise defective. While Defendants are likely correct about these May and June grievances, Plaintiff timely filed grievances in April. Accordingly, the Court need not consider these subsequent grievances. For these reasons, I recommend finding that Plaintiff properly exhausted his administrative remedies.

## ANALYSIS

A. Eight Amendment

In his Complaint, Plaintiff alleges that Defendants Valles and Aragon were deliberately indifferent to his medical care, in violation of the Eighth Amendment's prohibition against cruel

and unusual punishment.[4] Doc. 1-1 at 6-7. He also alleges that Defendant Bailly violated the Eighth Amendment by failing to provide treatment and failing to carry out medical orders. Doc. 1-1 at 7.

To sustain a claim under the Eighth Amendment for denial of medical attention, the plaintiff must prove "acts or omissions sufficiently harmful to evidence indifference to serious medical needs." *Olsen v. Layton Hills Mall*, 213 F.3d 1204, 1315 (10th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).[5] A showing of deliberate indifference requires both a subjective and objective component. *Id.* The subjective component is satisfied if the plaintiff can show that "a prison official 'knows of and disregards an excessive risk to [an] inmate's health or safety.'" *Sealock*, 218 F.3d at 1209 (quoting *Farmer v. Brennan*, 511 U.S. 815, 837 (1994)). "Essentially, the officer must 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Olsen*, 312 F.3d at 1315 (quoting *Garrett v. Stratman*, 254 F.3d 946, 949-50 (10th Cir. 2001)). The subjective component may be shown in two ways: "'First, a medical professional may fail to treat a serious medical condition properly,' and second, a prison official may act as a gatekeeper and 'prevent an inmate from receiving treatment or deny him access to medical personnel capable of

---

[4] Plaintiff sued seven defendants and does not specify which counts he brings against which defendants. However, Count II alleges cruel and unusual punishment against "the prison guards." Doc. 1-1 at 6. The only "prison guards" remaining in this case are Officer Valles and Counselor Aragon. Additionally, his response brief focuses on the deliberate indifference of Defendants Valles and Aragon. *See generally* Doc. 25.

[5] *Olsen* deals with a pretrial detainee, not a convicted prisoner as in this case. 312 F.3d at 1315. And while "[p]retrial detainees are protected under the Due Process Clause rather than the Eighth Amendment, . . . this Court applies an analysis identical to that applied in Eighth Amendment cases brought pursuant to § 1983." *Id.*

evaluating the need for treatment.'" *Sparks v. Singh*, 690 F. App'x 598, 604 (10th Cir. 2017) (quoting *Sealock*, 218 F.3d at 1211).

To satisfy the objective component, the medical need must be sufficiently serious. *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999). A medical need "is sufficiently serious 'if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Id.* (quoting *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980)). Additionally, "[d]elay in medical care only constitutes an Eighth Amendment violation where the plaintiff can show that the delay resulted in substantial harm." *Sealock*, 218 F.3d at 1210. "The substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quotation omitted).

### 1. Defendants Valles and Aragon

The parties present conflicting facts about whether Defendants Valles and Aragon subjectively knew about Plaintiff's medical need and disregarded the risk to his health. Plaintiff alleges that he informed both Defendants Valles and Aragon about his medical condition. Doc. 1-1, ¶¶ 20, 23. Specifically, he alleges that he objected to Counselor Aragon's instruction to write an informal complaint, informing Counselor Aragon that he was bleeding heavily. Doc. 1-1, ¶ 21. He further alleges that he informed Officer Valles that he was having a medical emergency. Doc. 1-1 ¶ 23.

Counselor Aragon, on the other hand, asserts that while Plaintiff asked to go to medical during count and said he was bleeding from his rectum, he also said that he was bleeding only a little and did not feel faint. Doc. 20-4 ¶¶ 5-6, 9. Counselor Aragon also asserts that he did not observe any blood, that Plaintiff did not appear pale, sweaty, or ill, that Plaintiff did not indicate he was having an emergency medical issue, and that Plaintiff agreed to wait until count was over

to go to medical. Doc. 20-4 ¶¶ 7, 10, 12-13. Officer Valles asserts that Plaintiff asked to go to medical both during and after count. Doc. 20-3 ¶¶ 5, 9. According to Officer Valles, during count, Plaintiff did not indicate he was having an emergency or that he was bleeding, and Officer Valles did not observe any blood. Doc. 20-3 ¶ 7. After count, Plaintiff again did not indicate he was having a medical emergency or that he was bleeding and Officer Valles again did not observe any blood.[6] Doc. 20-3 ¶¶ 11, 13.

This dispute in material fact as to the subjective component of deliberate indifference would normally preclude summary judgment. However, to be successful on his deliberate indifference claim, Plaintiff must show both the subjective and objective component. I recommend granting summary judgment in Defendants' favor because the facts are undisputed as to the objective component and, based on those facts, Plaintiff is unable to establish substantial harm resulting from Defendants' delay. *See Mata*, 427 F.3d at 752 ("[I]n order for [the plaintiff] to avoid summary judgment on [his] Eighth Amendment claims, [he] was required to set forth facts demonstrating that [his] medical need was objectively sufficiently serious, and that defendant's delay in meeting that need caused [him] substantial harm.").

In *Mata*, the Tenth Circuit clarified that to determine if a medical need is sufficiently serious, the Court can look to two types of harm: the ultimate harm to the prisoner or the prisoner's symptoms at the time of the prison employee's actions. 427 F.3d at 753. For example,

---

[6] Defendants assert that the Court should adopt their version of the facts because video from the prison "shows there was no visible blood on Plaintiff during the times at issue." Doc. 20 at 14. The Court declines to do this because a reasonable jurist could find Plaintiff's version of events credible. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). The Court has reviewed the video and agrees that there is no obvious visible blood. However, the Court cannot definitively say there was no blood on Plaintiff's pants because of the angle of the video and its quality. Additionally, Plaintiff presents evidence that after blood came through the seat of his pants, he took a shower. Doc. 1-1 ¶¶ 18, 20. After that, he again felt blood running down his leg, but he did not specify if the blood soaked through his pants. Doc. 1-1 ¶ 24.

an inmate who suffers a heart attack may make a claim based on intolerable chest pain and/or based on the subsequent heart damage. *Id.* It is up to the prisoner to select what harm to claim. *Id.* "Once the prisoner selects the harm, however, the focus of the objective prong should be solely on whether the harm is sufficiently serious. Then the court can turn to the causation . . . prong." *Id.*

In this case Plaintiff does not pinpoint what harm he believes was sufficiently serious. He does not assert any ultimate harm, such as permanent loss or life-long handicap. Indeed, once at the hospital, he was not rushed to emergency surgery, but prepped for a colonoscopy the next morning. Doc. 1-1 ¶ 37; Doc. 19-4 at 15. By his own account, and supported by the medical records, "surgery went well. The bleeding was stopped and a biopsy was taken." Doc. 1-1 ¶ 41; Doc. 19-4 at 2. He alleges no further harm related to the colonoscopy or his bleeding and the Court is unaware of any sufficiently serious ultimate harm.[7]

Turning to his symptoms at the time of the prison employees' actions, Plaintiff does present evidence that he suffered "severe nervousness, difficulty breathing, weakness and dizziness," and that he lost large amounts of blood while waiting to go to medical. Doc. 1-1 ¶¶ 21-22, 24, 28. Assuming those symptoms constitute a sufficiently serious medical need, Plaintiff does not show that the delay in receiving treatment caused by Defendants Valles and Aragon resulted in those symptoms.

Instead, Plaintiff presents evidence that he first noticed that he was bleeding large amounts of blood around 9:30 a.m. and so he proceeded to medical. Doc. 1-1, ¶¶ 8-14. While

---

[7] Plaintiff states that he has "seen countless heart doctors since his release from the Department of Corrections . . . ." Doc. 25 at 5. However, he does not specify the reason for seeing those doctors, including if it related to his colonoscopy and polyp.

Plaintiff sat in medical waiting to be seen, he continued bleeding, so he decided to return to his

unit to take a shower around 10:07 a.m. Doc. 1-1, ¶¶ 18-19. When he first asked Counselor

Aragon to return to medical some time during the 10:45 a.m. count, he was already "weak[] due

to the large amount of blood lost." Doc. 1-1 ¶ 22. Counselor Aragon told him to wait until count

cleared, then Officer Valles told him to wait until chow was called. Doc. 1-1 ¶¶ 20-23. When he

was finally able to return to medical at around 1:00 p.m. he again felt weakness, severe

nervousness, difficulty breathing, and dizziness. Doc. 1-1 ¶ 28. In sum, Plaintiff does not present

evidence that he suffered substantial harm as a result of Defendants' actions because he was

already experiencing the symptoms at the time he voluntarily left medical. He does not present

any evidence that his symptoms worsened as he waited to return to medical.[8]

   In contrast, for example, the Tenth Circuit in *Sealock* held that the plaintiff met his

burden to establish the objective element of the deliberate indifference test by presenting

evidence that he suffered from severe chest pain for several hours as a result of a prison official's

failure to get him treatment. 218 F.3d at 1210. In that case, the plaintiff woke up around 1:30

a.m. feeling unwell and sweating heavily. *Id.* at 1207-08. He told a prison official about his pain,

and the official informed him he would have to wait until the morning to see medical. *Id.* at

1208. About an hour later, the plaintiff was still experiencing chest pain, and so a shift

commander came to his cell, again telling him to wait until the morning. *Id.* In contrast here,

Plaintiff began feeling symptoms, went to medical, voluntarily left medical, and continued

feeling symptoms while waiting to return to medical. Such facts do not show that the delay

caused by Defendants Valles and Aragon caused him substantial harm and Plaintiff is therefore

---

[8] Plaintiff asserts that the delay "could have resulted in substantial harm" and that he was as a very high risk of heart failure. Doc. 25 at 5. These unsupported statements that Plaintiff made for the first time in his response brief do not create a genuine issue of material fact.

unable to meet the objective component for a deliberate indifference claim. For these reasons, I recommend granting summary judgment in Defendants Valles and Aragon's favor as to Plaintiff's Eighth Amendment claim against them.

### 2. Defendant Bailly

Plaintiff does not specifically state in his Complaint what conduct of NP Bailly he believes constitutes deliberate indifference. Count II of his Complaint for Cruel and Unusual Punishment is subdivided into "Deliberate Indifference to Serious Medical Needs" and "Failure to Carry Out Medical Orders." Doc. 1-1 at 6-7. Both sections list case law without specifying which defendants are alleged to have been deliberately indifferent or failed to carry out medical orders. However, in his statement of facts, Plaintiff alleges the following against NP Bailly: when Plaintiff first went to medical, he sat outside NP Bailly's office waiting to be seen while NP Bailly talked to another inmate about her dog, Doc. 1-1 ¶ 18; after returning to medical, all NP Bailly said she could do was schedule a colonoscopy, but then she told Plaintiff he would need to go to the emergency room, Doc. 1-1 ¶¶ 31, 33; and after returning from the hospital, NP Bailly changed some of the medications the hospital prescribed, including changing the time Plaintiff received his blood thinning medication, and he never received certain medications prescribed by the hospital, Doc. 1-1 ¶¶ 45, 53, 57. A review of each alleged conduct shows that Plaintiff is unable to meet the subjective component of deliberate indifference as to any claim against NP Bailly.

As discussed above, a showing of deliberate indifference requires both a subjective and objective component. *Olsen*, 213 F.3d at 1315. The subjective component may be shown in two ways: failure to treat a serious medical condition properly or failure to act as a gatekeeper in denying access to medical treatment. *Sparks*, 690 F. App'x at 604 (quoting *Sealock*, 218 F.3d at

1211). Regarding failure to treat, "accidental or inadvertent failure to provide adequate medical care, or negligent diagnosis or treatment of a medical condition do not constitute a medical wrong under the Eighth Amendment." *Ramos*, 639 F.2d at 575. To that end, "a mere difference of opinion between the prison's medical staff and the inmate as to the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment." *Id.*

First, Plaintiff alleges that when he initially went to medical, he sat outside NP Bailly's office while she talked to another inmate about her dog. Doc. 1-1 ¶ 18. The undisputed facts show that after being seen by another nurse, Plaintiff waited by himself for NP Bailly from 9:56 a.m. to 10:05 a.m., at which point he left to return to his unit and take a shower. Doc. 1-1 ¶ 19; Doc. 20-2, Ex. 9. Plaintiff presents no facts to show that, while he was waiting, NP Bailly knew of and disregarded an excessive risk to his health. Additionally, the 9 minute wait shows, at most, negligence, which does not rise to the level of deliberate indifference.

Second, Plaintiff alleges that after he returned to medical, NP Bailly told him the most she could do was order a colonoscopy and then told him he would need to go to the emergency room first. Doc. 1-1 ¶¶ 31, 33. And indeed, NP Bailly reported to Dr. Deming that Plaintiff may need to be seen at the emergency room and she signed his transfer order. Doc. 19-4 at 37; Doc. 20-5 at 3. However, in his response brief, Plaintiff argues that NP Bailly never examined him and that he "was only sent [to] the emergency room at the advice of the caller whom Defendant Bailly had to call." Doc. 25 at 6. Yet, even if NP Bailly called someone for advice, was told to send Plaintiff to the emergency room, and then sent Plaintiff to the emergency room, Plaintiff fails to show how such action constitutes a deliberate indifference to his medical needs. His difference of opinion on how to be treated does not establish an Eighth Amendment claim when NP Bailly got him the treatment he needed.

Finally, Plaintiff alleges that NP Bailly changed some of the medications he was prescribed by the hospital, including changing the time he received his blood thinning medication, and he that never received certain medications. Again, this difference of opinion in medical treatment does not establish deliberate indifference. For example, in *Perkins v. Kansas Department of Corrections*, the plaintiff conceded that he received certain medication to treat HIV, but asserted that the prison failed to give him a protease inhibitor. 165 F.3d 803, 811 (10th Cir. 1999). The court found that the prison officials recognized the plaintiff's serious medical condition and were treating it; the "plaintiff simply disagrees with medical staff about the course of his treatment." *Id.* This disagreement, the court held "does not give rise to a claim for deliberate indifference to serious medical needs." *Id.*

Similarly here, on return from the hospital, NP Bailly reviewed the recommended medications and although she did not order all of them, she ordered Xarelto. Doc. 19-4 at 16, 38. After Plaintiff complained about his medication, NP Bailly reviewed the report from the hospital and wrote a follow-up note that "[i]t does not matter what time [Plaintiff] takes his Xarelto as there is no requirement for INR." Doc. 19-4 at 17-27. Additionally, in reviewing Plaintiff's grievance, the Grievance Officer investigated and determined that Plaintiff had received proper medical treatment on return from the hospital. Doc. 20-6 at 50. Plaintiff may disagree about which medications he should have received and the timing of those medications, but such a disagreement does not rise to the level of deliberate indifference to a serious medical need. *See Gee v. Pacheco*, 627 F.3d 1178, 1192 (10th Cir. 2010) ("[The plaintiff] alleges that he was not given the medications he desired for his headaches; but he admits being given other medications, so his complaint amounts to merely a disagreement with [the prison official's] medical judgment

concerning the most appropriate treatment . . . . Disagreement with a doctor's particular method of treatment, without more, does not rise to the level of an Eighth Amendment violation.").

Because Plaintiff is unable to meet the subjective component of his claim for deliberate indifference against Defendant Bailly, I recommend granting summary judgment in Defendant Bailly's favor.

### B.  Medical Malpractice against Defendant Bailly

Plaintiff also alleges that Defendant Bailly committed medical malpractice when she "refused to adequately respond to the medical emergency when made aware." Doc. 1-1 at 6. A claim for medical malpractice under New Mexico law requires that "a plaintiff must show that (1) the defendant owed the plaintiff a duty recognized by law; (2) the defendant breached the duty by departing from the proper standard of medical practice recognized in the community; and (3) the acts or omissions complained of proximately caused the plaintiff's injuries." *Brown v. Kellog*, 2015-NMCA-006, ¶ 6, 340 P.3d 1274.

The Court has supplemental jurisdiction over this state-law claim pursuant to 28 U.S.C. § 1367. Nonetheless, the Court may decline supplemental jurisdiction if it has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). The Tenth Circuit has indicated that if, prior to trial, "all federal claims have been dismissed, the court may, *and usually should*, decline to exercise jurisdiction over any remaining state claims." *Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998) (emphasis added); *see also Barnett v. Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.*, --- F.3d ---, 2020 WL 1910439, at *6 (10th Cir. Apr. 20, 2020) (reversing a district court for failing to decline supplemental jurisdiction). Even where the parties have expended considerable effort in litigating the state-law claims in the federal forum, including conducting full discovery, it is appropriate to decline to exercise supplemental jurisdiction because that discovery can be used in state court. *Huntsinger*

26

*v. Bd. of Dir. of E-470 Pub. Highway Auth.*, 35 F. App'x 749, 759-60 (10th Cir. 2002); *see, e.g.*, *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011) (affirming a district court decision to decline supplemental jurisdiction after granting summary judgment on the federal claims). Further, the Supreme Court has indicated that in a removed case, like the instant case, remand is often preferable to dismissal without prejudice in order to "best promote the value of economy, conveniences, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 353 (1988).

Accordingly, I recommend declining supplemental jurisdiction over the medical malpractice claim arising under state law and remanding it to state court.

## RECOMMENDATIONS

For the above-stated reasons, I recommend as follows:

1)   Dismiss with prejudice the claims against Defendants Judd, Leyba, and Centurion;

2)   find that Plaintiff exhausted his administrative remedies as to his Eighth Amendment claims against Defendants Valles, Aragon, and Bailly;

3)   grant summary judgment in favor of Defendants Valles and Aragon on Plaintiff's claim for deliberate indifference of medical needs in violation of the Eighth Amendment;

4)   grant summary judgment in favor of Defendant Bailly on Plaintiff's claims for deliberate indifference of medical needs in violation of the Eighth Amendment;

5)      and decline to exercise supplemental jurisdiction over the state-law medical

malpractice claim against Defendant Bailly and remand the claim to the Thirteenth Judicial

District Court of New Mexico.


_____
UNITED STATES MAGISTRATE JUDGE


**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of

a copy of these Proposed Findings and Recommended Disposition they may file written

objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A party must**

**file any objections with the Clerk of the District Court within the fourteen-day period if**

**that party wants to have appellate review of the proposed findings and recommended**

**disposition.  If no objections are filed, no appellate review will be allowed.**